**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **RHONDA WILLIAMS,** | ) | |
| | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **No. 05 C 2151** |
| **v.** | ) | |
| **ILLINOIS DEPARTMENT OF** | ) | **JUDGE DAVID H. COAR** |
| **CORRECTIONS, DWAYNE CLARK,** | | |
| **THOMAS HILLIARD, and MARK DELIA,** | | |
| | ) | |
| | ) | |
| **Defendants.** | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Rhonda Williams ("Plaintiff") is suing the Illinois Department of Corrections and individual defendants Dwayne Clark, Thomas Hilliard, and Mark Delia (collectively, "Defendants") for sex discrimination, retaliation, and hostile work environment in violation of Title VII of the Civil Rights Act of 1964 and 42 U.S. C. § 1983. Before this court is Defendants' motion for summary judgment. For the reasons set forth below, Defendants' motion is GRANTED IN PART and DENIED IN PART.

**I.     SUMMARY JUDGMENT STANDARD**

Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A genuine issue of material fact exists only if there is

sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986). The movant bears the burden of establishing that no genuine issue of material fact exists. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986). If the movant meets this burden, the non-movant must set forth specific facts (a "scintilla of evidence" is insufficient) demonstrating that there is a genuine issue for trial. <u>Fed. R. Civ. P. 56(e)</u>; <u>Anderson</u>, 477 U.S. at 252. <u>See also Celotex</u>, 477 U.S. at 324. When reviewing a motion for summary judgment, the court must view the facts in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. <u>See Schuster v. Lucent Technologies, Inc.</u>, 327 F.3d 569, 573 (7th Cir. 2003).

## II.    FACTS

Plaintiff was a Juvenile Parole Agent with Illinois Department of Corrections ("IDOC") from April 2002 until October 2003.

Defendant Thomas Hilliard ("Hilliard") was Plaintiff's supervisor. He served as acting Juvenile Parole Supervisor from August 29, 2001 until January 1, 2003, and has served as Juvenile Parole Supervisor since then. As supervisor, Hilliard oversees a team of twenty juvenile parole agents and senior juvenile parole agents. While Hilliard does not have the power to hire or fire agents, the facts are in dispute as to his ability to mete out discipline. The procedure for suspected discipline cases, however, involves an entity called the Employee Review Board ("ERB").

Defendant Delia ("Delia"), at all relevant times, was Chief of Apprehension and also supervised Hilliard. The facts are in dispute as to Delia's disciplinary powers and the extent of

his responsibility for parole unit supervisors like Hillard, but the parties agree that Delia did not have the authority to hire, fire, or discipline parole unit supervisors or juvenile parole agents like Plaintiff who belonged to the American Federation of State, County and Municipal Employees Union ("union").

Defendant Clark ("Clark") was the Chief to whom Delia reported.

Plaintiff's Incident Reports

On January 7, 2003, Plaintiff sent Janet Richmond ("Richmond"), Administrator of the IDOC's Office of Affirmative Action, an incident report ("January Incident Report"). Plaintiff alleged in the report that, on January 3, 2003, when Plaintiff asked for a schedule change, Hilliard walked away responding "I AM NOT GIVING YOU ANY THING [sic], ALL YOU FEMALES ARE WORTHLESS." A human resources representative nearby heard the statement and questioned Hilliard, who replied "I AM NOT TALKING ABOUT YOU, I AM TALKING ABOUT THE AGENTS." (For his part, Hilliard denies these statements and disputes the reasons why he refused to change Plaintiff's schedule.) Plaintiff also wrote in the incident report that Hilliard had in the past, and in her presence, made offensive comments degrading women who worked directly under him. Further, she recounted that in a December 16, 2002 staff meeting presided over by Hilliard and attended by Plaintiff, Hilliard stated to a departing female agent "YOU WERE A GOOD AGENT FOR A FEMALE." (This remark, Plaintiff believes, silently and negatively references Plaintiff.) Finally, Plaintiff wrote that Hilliard told a female agent and other listeners that he assigned the agent to a particular region because a woman could not "handle" being assigned elsewhere. Plaintiff has submitted affidavits which bear out these last

two allegations and also reveal that the agent Hilliard assigned on the basis of her gender did not complain for fear of retaliation.

Plaintiff forwarded a copy of her report to Hilliard, who then forwarded it to Delia—all on January 7, 2003. Shortly after receiving the report, Delia sent Plaintiff an email questioning why the report—and the opportunity to address the problem—had bypassed him given that he was Hilliard's supervisor. Hilliard, after seeing the incident report, sent an email to Delia accusing Plaintiff of several acts, including repeatedly asking to be reassigned, referring to people on the "West Side" [of Chicago] as "Niggas" and "crazy," and not wanting to work in the "ghetto." Hilliard also accused Plaintiff of abusing sick time and asking to do personal business on IDOC time. At the close of the email, Hilliard surmised that Plaintiff was accustomed to getting her way "because she was a FEMALE." Plaintiff contends that, before January 2003, Hilliard never raised any performance issues with Plaintiff or complained to Delia about her. Plaintiff also observes that it is well known that Hilliard and Delia are personal friends.

On October 22, 2003, Plaintiff filed a second incident report ("October Incident Report"). That report detailed two incidents of harassment by Hilliard. First, Plaintiff described the circumstances leading up to Hilliard's accusing her, on October 21, 2003, of falsifying a time slip for October 17, 2003. Second, Plaintiff described an evaluation she received on September 16, 2003. Hilliard had given Plaintiff a negative rating for at least three areas he never previously discussed with Plaintiff. In addition, Plaintiff complained, Hilliard had written derogatory comments of a personal nature in the evaluation. A union representative subsequently spoke with Hilliard about these "personal attacks" and Hilliard agreed to make

changes to the evaluation. When Plaintiff received the evaluation a month later, however, Hilliard had signed it without making any changes. Plaintiff concludes the October Incident Report by describing her mental state as a result of the alleged harassment; citing relevant portions of IDOC policy on sexual harassment; stating that the harassment created a hostile work environment for her; and noting that colleagues have continued to inform her about Hilliard's negative and degrading comments.

The Office of Affirmative Action's Investigation

Richmond investigated Plaintiff's January Incident Report by interviewing Plaintiff, Hilliard, three persons Plaintiff identified in the report, and four persons Plaintiff identified during her interview with Richmond. Richmond sent the results of the investigation to Delia on February 4, 2003 and to Plaintiff three days later. In short, Richmond concluded that it did not appear that Hilliard had discriminated against women or retaliated against Plaintiff, but it did appear that he had made inappropriate statements that degraded women. She recommended corrective action be taken. Richmond also questioned Hilliard's decision to force Plaintiff to use (documented) "personal time" to retrieve her driver's license on a day she inadvertently left it at home, when Plaintiff had used her lunch hour to receive the ID.

On February 4, 2003 (the day the Richmond published her results), Plaintiff met with Delia in his office. During their conversation, Delia informed Plaintiff that her case files were going to be audited, but not by Hilliard. In the end, however, Hilliard did audit Plaintiff's case files. Plaintiff believes that Delia and his supervisor, Chief Clark, had always intended Hilliard to audit her files.

As a result of Plaintiff's January Incident Report, Hilliard was referred to the ERB. According to the Hearing Officer's report, Hilliard claimed in the hearing that subordinate staff had fabricated 98% of the allegations and the remaining 2% [of his alleged comments] was joke; that Plaintiff had complained because he did not change her schedule; and that four of the parole agents (including Plaintiff) had collaborated to bring the complaint because they dislike him and disagree with his disciplinary decisions. Hilliard received an oral reprimand at that hearing.

Richmond investigated Plaintiff's October Incident Report by interviewing Plaintiff, Hilliard, and a person identified by Plaintiff in the report. In the results published on December 22, 2003, Richmond noted that the October time slip incident had been resolved through the union. But she recommended that Hilliard's negative comments in Plaintiff's evaluation be removed and that the areas where Hilliard marked Plaintiff's objectives as "unmet" be upgraded to met. Plaintiff's performance evaluation was changed accordingly.

The parties dispute whether any other IDOC employee aside from Plaintiff made oral or written complaints about discriminatory or harassing treatment by Hilliard or Delia. Plaintiff contends, however—and the affidavits submitted by the parties support her contention—that each woman under Hilliard's supervision interviewed by Richmond confirmed allegations in Plaintiff's incident reports.

<u>Plaintiff's Additional Allegations</u>

In addition to the allegations contained in the incident reports, Plaintiff alleges that (1) Hilliard commented on another agent's bra size outside of Plaintiff's presence; (2) Hillard made a remark, outside of Plaintiff's presence, to two female employees about their menstrual cycles; (3) Hilliard sent Plaintiff a counseling memo about turning in her weekly activity reports on time; (4) Plaintiff submitted her vacation request on January 31, 2003, but Hilliard approved other agents' requests before approving hers on February 5, 2003 (Defendants note that Plaintiff did gain approval before Hilliard's March 1 deadline); (5) Hilliard denied Plaintiff's request to change the one night per week that she must work late; (6) Plaintff was singled out for an ID-check when at least three other agents were not; (7) After the ID-check, Plaintiff was referred for discipline for failing to have her driver's license while another male juvenile parole agent, at some other time, was not similarly referred; (7) Delia told Plaintiff that Hilliard should have "written her ass up" for failing to report her lost pager; (8) Hilliard asked a male agent who had returned from lunch with a group female agents if "it took him two hours to fuck those girls?;" (9) Hilliard referred to another female agent as his "booty;" (10) on several occasions, Hilliard used the word "bitch" in reference to women, including his wife; and (11) Plaintiff repeatedly complained to Hilliard, who was responsible for ensuring that agents had adequate, working equipment, that her vehicle did not have a barrier.

Plaintiff contends that every female parole agent named in Hilliard's affidavit transferred from under his supervision because of his behavior and comments.

Only authorized employees who possess a legally valid driver's license may operate IDOC vehicles. IDOC policy also requires juvenile parole agents to possess other identification, such as a firearm owner's identification card, at all times. The parties dispute whether all juvenile parole agents are checked for their identification when one of them is checked, but Plaintiff states that this is clearly not the case. According to Plaintiff, at a monthly staff meeting on January 27, 3003, she was singled out for an ID check. Hilliard referred Plaintiff—the parties dispute exactly when—to the ERB for failing to possess her driver's license. Defendants maintain that Plaintiff ultimately was not disciplined for failure to possess her driver's license (or, for that matter, for the loss of her pager or her failure to timely submit weekly activity reports). Indeed, Plaintiff's personnel file shows no record of formal discipline, demotion, or decrease in pay during her employment with the IDOC. Plaintiff, noting that she was referred to the ERB for a disciplinary hearing (that never took place), disputes this. Plaintiff admits that she drove to work in her State vehicle that day without her driver's license.

As a separate matter, IDOC case management policy requires juvenile parole agents to make face-to-face contact with and track the progress of juvenile parolees. The facts are in dispute regarding IDOC policy governing how agents must document their case contacts (i.e., whether by calling into a phone system and/or by writing weekly reports), and how, if at all, Hilliard enforced the policy. On February 13, 2003, however, Hilliard sent Plaintiff a memorandum advising her that she was required to submit her weekly activity reports on a weekly basis. Plaintiff maintains that another juvenile parole agent supervised by Hilliard and

Delia did not submit many weekly activity reports and was not similarly disciplined (although what Plaintiff means by "disciplined" is unclear).

Plaintiff's Health

Plaintiff's contends that Defendants' treatment ultimately forced her to take medical leave and seek psychiatric help. Dr. Earl Thornton prescribed Plaintiff medication for stress and anxiety related to work, and authorized Plaintiff take a job-related stress leave (unpaid) from February 2003 to early May 2003. Dr. Thornton also referred Plaintiff to Dr. Hannah Frisch, a psychotherapist. Dr. Frisch treated Plaintiff for sleeplessness, anxiety, depression, loss of appetite, and frequent worry, fear and preoccupation about what would happen when she had to return to work. Dr. Frisch's diagnosis of anxiety and depression did not change over a six-month period of treatment.

Count I (sex discrimination and retaliation) of Plaintiff's complaint is a Title VII claim against the IDOC. Counts II (sex discrimination) and III (hostile work environment) are § 1983 claims against Defendants Clark, Hilliard, and Delia in their individual capacities.[1] Defendants move for summary judgment on all three counts.

---

[1] Plaintiff withdrew Count IV (a § 1983 First Amendment retaliation claim) in her Response. See Pl.'s Resp. at 2 n.1. This Court dismissed a final count, Count V (intentional infliction of emotion distress), as time-barred, as stated in open court on November 15, 2005.

## III.  DISCUSSION

### A.  Sex Discrimination

Count I of Plaintiff's complaint alleges that the IDOC engaged in sex discrimination in violation of Title VII.  Count II likewise alleges that Clark, Hilliard, and Delia engaged in sex discrimination, but in violation of § 1983 and the Equal Protection Clause of the Fourteenth Amendment.  Defendants move for summary judgment on the grounds that Plaintiff has not established that Defendants discriminated against her on the basis of sex.

Title VII makes it unlawful for an employer to discriminate against an employee because of his or her sex.  42 U.S.C. § 2000e-2(a)(1).  To prove Title VII sex discrimination, Plaintiff may proceed either directly (by presenting direct or circumstantial evidence of the employer's discriminatory intent), or indirectly, through the burden-shifting method outlined in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).  See, e.g., Whittaker v. Northern Illinois University, 424 F.3d 640, 647 (7th Cir. 2005).  Regardless of how Plaintiff proceeds, "[o]nly those acts resulting in adverse employment actions are cognizable under Title VII."  Oest v. Illinois Department of Corrections, 240 F.3d 605, 612 (7th Cir. 2001).  Cf.  Haugerud v. Amery School District, 259 F.3d 678, 691 (7th Cir. 2001) ("Plaintiff may establish a violation of Title VII by presenting evidence of discriminatory intent, whether it be direct or circumstantial, or she may proceed under the McDonnell Douglas burden-shifting method.  Either way, however, *the plaintiff must prove that her 'terms, conditions, or privileges of employment' were affected*, 42 U.S.C. § 2000e-2(a)(1); that is, *she must show that she suffered a materially adverse employment action*.") (emphases added).

An adverse employment action "is a significant change in the claimant's employment status such as hiring, discharge, denial of promotion, reassignment to a position with significantly different job responsibilities, or an action that causes a substantial change in benefits." Rhodes v. Illinois Dept. of Transportation, 359 F.3d 498, 504 (7th Cir. 2004). Other examples include "a demotion evidenced by a decrease in wage or salary, a less distinguished title . . . or other indices that might be unique to a particular situation." Oest, 240 F.3d at 612-13. But "a mere inconvenience or an alteration in job responsibilities" or other "minor and even trivial employment actions that an employee [does] not like" cannot form the basis of a discrimination suit. See id.

Plaintiff complains that she was singled out for enforcement of a policy on submitting weekly activity reports, singled out for an ID check, unfairly reprimanded for not having her driver's license (that is, referred for a discipline hearing that ultimately did not take place), denied a schedule change, subjected to an audit (by none other than the supervisor she accused of harassment), given a negative performance evaluation, and denied rapid approval of her vacation request. While many of these acts may have been vexing (perhaps purposefully so), none of them resulted in a material change in the terms, conditions, or privileges of Plaintiff's employment. Cf. Haugerud, 259 F.3d at 691-92. In fact, the Seventh Circuit has ruled that most of these acts are not actionable. See id. (additional job responsibilities); Oest, 240 F.3d at 613 (negative performance evaluations, oral or written reprimands absent some tangible job consequence); Grube v. Lau Industries, Inc., 257 F.3d 723, 728 (7th Cir. 2001) (altered schedule); Griffin v. Potter, 356 F.3d 824, 829 (7th Cir. 2004) (citing Brooks v. City of San

Mateo, 229 F.3d 917, 930 (9th Cir. 2000) (refused preferred vacation schedule when refusal was not final)); Bell v. EPA, 232 F.3d 546, 555 (7th Cir. 2000) (trivial matters).[2]

Thus, Plaintiff's Title VII claim fails—as does, as a consequence, her § 1983 Equal Protection claim. A discrimination claim under the Equal Protection Clause is subject to the same methods of proof as an analogous claim under Title VII: "Under both Title VII and § 1983, the plaintiff is required to establish that she has been the victim of intentional discrimination" using her choice of the direct or indirect methods referenced above. Bruno v. City of Crown Point, 950 F.2d 355, 361 (7th Cir. 1991). See also Collins v. Norris, 100 Fed. Appx. 553, 555 (7th Cir. 2004) (suggesting that it is difficult for a plaintiff to prevail under § 1983 but not Title VII given their "similar substantive requirements"). The similarity between the two statutes means that Plaintiff must still identity an adverse employment action, even when proceeding under § 1983. Cf. McPhaul v. Board of Commissioners of Madison County, 226 F.3d 558, 566 (7th Cir. 2000) (quoting Southard v. Texas Board of Criminal Justice, 114 F.3d 539, 555 (5th Cir. 1997) ("Not every negative employment decision or event is an adverse employment action that can give rise to a discrimination or retaliation cause of action under section 1983.")). Because Plaintiff has failed to demonstrate that she suffered an adverse employment action, her sex discrimination claims under both Title VII and § 1983 fail as a matter of law.

---

[2] Even though Plaintiff has not advanced the following (or any) argument regarding *what* actions qualify as adverse employment actions, the Court goes further to find that Plaintiff has also not shown that Hilliard's apparent hostility toward her amounted to an adverse employment action. "General hostility and comments do not qualify as actionable adverse employment actions unless the hostility was severe and pervasive." Griffin, 356 F.3d at 829. Severe and pervasive are qualities, as will be discussed below, that Plaintiff has not proven.

**B.** **Retaliation**

Count I also charges the IDOC with retaliation in violation of Title VII. "Title VII prohibits employers from punishing employees for complaining about discrimination or other practices that violate Title VII." Moser v. Indiana Dept. of Corrections., 406 F.3d 895, 903 (7th Cir. 2005) (citing 42 U.S.C. § 2000e-3(a)). Plaintiff may prove retaliation by using either the direct method or the indirect, burden-shifting method referenced above.

Under the direct method, Plaintiff must show that: (1) she engaged in statutorily protected activity; (2) she suffered an adverse employment action; and (3) a causal connection existed between the two. See id. Under the indirect method, Plaintiff first must establish a prima facie case of retaliation by showing that: (1) she engaged in a statutorily protected activity; (2) she met the employer's legitimate expectations; (3) she suffered an adverse employment action; and (4) she was treated less favorably than similarly situated employees who did not engage in statutorily protected activity. See id. If Plaintiff establishes this prima facie case, the burden shifts to Defendants to produce a legitimate, non-discriminatory reason for their employment action. If they do so, the burden shifts back to Plaintiff to demonstrate that Defendants' reason is pretextual. See id.

Ordinarily, it would seem that Plaintiff's failure to show that she suffered an adverse employment action dooms her retaliation claim as it did her sex discrimination claim. Just recently, however, the Supreme Court rejected any approach that applies the same standard for the "substantive discrimination offense" (here, sex discrimination) to retaliation and consequently would require a plaintiff to challenge only actions resulting in an adverse effect on the terms, conditions, or benefits of his or her employment. Burlington Northern and Santa Fe

Railway Co. v. White, 126 S. Ct. 2405, 2419 (2006). Instead, the Court held, a plaintiff need only show that "a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." Id. at 2415 (internal quotation marks omitted). This standard is general, the Court wrote, because "the significance of any given act of retaliation will often depend upon the particular circumstances." Id. Moreover, the "standard does *not* require a reviewing court or jury to consider the nature of the discrimination that led to the filing of the charge." Id. at 2416 (internal quotation marks omitted) (emphasis in original). "[T]he standard is tied to the challenged retaliatory act, not the underlying conduct that forms the basis of the Title VII complaint." Id. The Court concluded, "[b]y focusing on the materiality of the challenged action and the perspective of a reasonable person in the plaintiff's position, we believe this standard will screen out trivial conduct while effectively capturing those acts that are likely to dissuade employees from complaining or assisting in complaints about discrimination." Id. Thus, Plaintiff can survive summary judgment on her retaliation claim by satisfying the elements listed above and, in doing so, showing a dispute of fact as to whether a reasonable employee would have found Defendants' actions materially adverse.

Plaintiff does not state whether she wishes to proceed under the direct method or the indirect method, but the Court finds that she may proceed under the former. See Sylvester v. SOS Children's Villages Illinois, Inc., 453 F.3d 900, 902 (7th Cir. 2006) (holding that "if [the plaintiff] can prove by means of circumstantial evidence that he engaged in protected activity (filing a charge of discrimination) and as a result suffered the adverse employment action of which he complains, that is fine" under the direct method) (internal quotation marks omitted); id.

at 904 (holding that an admission of intentional discrimination or a "rich mosaic of circumstantial evidence" is not necessary to proceed under the direct method). Plaintiff undoubtedly satisfies the first element: Defendants do not dispute that Plaintiff engaged in statutorily protected expression by submitting incident reports about Hilliard's behavior.

As to the second element, there is a genuine issue as to whether a reasonable jury could conclude that the actions Plaintiff has deemed retaliatory are indeed actions a reasonable employee would find materially harmful. Viewed in the light most favorable to Plaintiff, those actions are: (1) being targeted for enforcement of a policy on submitting weekly activity reports (there is a dispute of fact as to the nature of this policy); (2) being singled out for an ID check (Plaintiff testified that the officer did not check three other agents' IDs at that meeting); (3) being approved for vacation after others' requests had already been approved; (4) being told, without being told why, that her files were going to be audited; (5) being audited by the supervisor she accused of harassment when Delia explicitly assured her this would not happen; and (6) being given a negative performance evaluation by the accused supervisor. A reasonable jury could conclude that this course of events would dissuade a reasonable employee from complaining about discrimination or harassment. The jury need not conclude that these events were related to the terms and conditions of Plaintiff's employment. See Burlington Northern, 126 S. Ct. at 2416.

Likewise, there is sufficient evidence for a reasonable jury to find for Plaintiff on the third element—whether a causal connection exists between Plaintiff's complaints and the actions described above. Plaintiff submitted her first incident report on January 7, 2003. The same day, Hilliard sent an email to Delia detailing various unprofessional actions he considered Plaintiff to

have taken.  On January 27, 2003, an officer checked Plaintiff for her identification cards, and the parties dispute whether other parole agents were similarly checked.  On February 4, 2003, the same day Richmond published the results of her investigation into Plaintiff's incident report, Delia informed Plaintiff that her case files were to be audited.  On February 13, 2003, Hilliard sent a memorandum to Plaintiff, and perhaps only Plaintiff, about submitting her weekly activity reports on time.  Finally, after Plaintiff submitted the January Incident Report, Hilliard's very next annual review was extremely negative and cited her for matters he had not previously discussed with Plaintiff.  Such "suspicious timing" constitutes circumstantial evidence that can support Plaintiff's claim of retaliation.  Hunt-Golliday v. Metropolitan Water Reclamation District of Greater Chicago, 104 F.3d 1004, 1014 (7th Cir. 1997).  That the audit, the ID check, and Hilliard's assorted, negative appraisals of Plaintiff's performance all followed closely her initial complaint of sexual harassment creates an inference of causality which, if true, allows Plaintiff to establish a prima facie case of retaliation.  See id. at 1015.

Given this and the need for a jury to determine whether a reasonable employee would find Defendants' actions materially adverse, Defendants are not entitled to summary judgment on Plaintiff's retaliation claim.  See generally Anderson, 477 U.S. at 255 (holding that weighing evidence, determining credibility, and drawing reasonable inferences are jury functions, not those of a judge deciding a motion for summary judgment).

### C.      Hostile Work Environment

Count III alleges that Clark, Delia, and Hilliard created a hostile work environment in violation of § 1983 and the Equal Protection Clause by requiring Plaintiff to "tolerate and endure

Hilliard's inappropriate comments." Compl. ¶ 49. As above, the Court applies to Plaintiff's § 1983 claim the standard applied to hostile work environment claims under Title VII. See McPhaul, 226 F.3d at 567 n.6 (adopting the same approach since "§ 1983 claims generally follow the contours of Title VII claims") (internal quotation marks omitted). To survive summary judgment, Plaintiff must show that (1) she was subjected to unwelcome harassment on the basis of her sex; (2) the harassment was so severe or pervasive as to alter the conditions of her work environment; and (3) there is a basis for employer liability. See Krieszcher v. Fox Hills Golf Resort and Conference Center, 384 F.3d 912, 915 (7th Cir. 2004).

Defendants argue that Plaintiff's claim fails as a matter of law because, among other things, she was not subjected to "unwelcome sexual harassment in the form of sexual advances, requests for sexual favors or other verbal or physical conduct of a sexual nature." See Hall v. Bodine Electric Co., 276 F.3d 345, 355 (7th Cir. 2002). The standard, however, is broader than the iteration in Hall and similar cases. As the Supreme Court explained in Oncale v. Sundowner Offshore Services, Inc., 523 U.S. 75 (1998):

> Title VII . . . is directed only at "discriminat[ion] . . . because of . . . sex." We have never held that workplace harassment, even harassment between men and women, is automatically discrimination because of sex merely because the words used have sexual content or connotations. The critical issue, Title VII's text indicates, is whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed.

Id. at 80. Accord Wyninger v. New Venture Gear, Inc., 361 F.3d 965, 975 (7th Cir. 2004) ("In order to maintain an actionable claim of hostile work environment, [the plaintiff] must first demonstrate that a supervisor or coworker harassed her because of her sex."); Smith v. Sheahan, 189 F.3d 529, 533 (7th Cir. 1999) ("To be actionable, the offensive conduct must be based on one of the characteristics protected by Title VII, such as sex.").

Thus, the relevant question is not whether Hilliard made sexual advances to Plaintiff or touched her in an offensive way; the question is whether Defendants' conduct exposed Plaintiff to disadvantageous conditions of employment because she is a woman.  Answering this question involves a disputed fact.  According to Plaintiff (and the human resources representative, a bystander whose story the affidavits support), Hilliard denied her request for a schedule change because, he proclaimed, "ALL . . . FEMALES ARE WORTHLESS."  He confirmed his position seconds later by explaining that he specifically considered female agents like Plaintiff to be worthless.  Defendants deny Hilliard's remarks.  Nonetheless, if truthfully recounted, the remarks are evidence of Plaintiff's exposure to disadvantageous employment terms because of her sex.

Although there is genuine issue of material fact as to the first element of Plaintiff's hostile work environment claim, there is no possibility that a reasonable jury could return a verdict for Plaintiff as to the second element.  Not all conduct that is harassing and affects a term or condition of employment is actionable; the conduct must be "both subjectively and objectively so severe or pervasive as to alter the conditions of employment and create an abusive working environment."  Wyninger, 361 F.3d at 975.  See also  Meritor Saving Bank, FSB v. Vinson, 477 U.S. 57, 67 (1986).   "In determining whether contested conduct actually creates an objectively hostile work environment, a number of factors may be considered including 'frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'"  Hilt-Dyson v. City Of Chicago, 282 F.3d 456, 463 (7th Cir. 2002) (quoting Faragher v. City of Boca Raton, 524 U.S. 775, 787-88 (1998)).

The Court accepts that *Plaintiff* found her environment hostile, if only because of the extensive physical and mental health treatment she required.  Cf. Gentry v. Export Packaging Co., 238 F.3d 842, 850 (7th Cir. 2001) ("The effect on the employee's psychological well-being is, of course, relevant to determining whether the plaintiff actually found the environment abusive.").  But in addition to showing that *she* perceived Hilliard's comments as hostile or abusive, Plaintiff must show that a reasonable person would as well.  See Hilt-Dyson, 282 F.3d at 463.  Plaintiff cannot do so for several reasons.

First, the case law essentially restricts the Court's analysis to the comments that Plaintiff heard Hilliard make.  "[A]n objectively hostile work environment will not be found where most of the conduct that forms the basis of a plaintiff's claim consists of derogatory statements made by supervisors or co-workers out of her hearing," when the other conduct is "isolated and not particularly severe."  Whittaker v. Northern Illinois University, 424 F.3d 640, 645 (7th Cir. 2005) (internal quotation marks and alterations omitted).  Accord Valentine v. City of Chicago, 452 F.3d 670, 681 (7th Cir. 2006) ("In the case of discriminatory statements, we must assess . . . whether the remarks were stated directly to the plaintiff or whether the plaintiff heard them secondhand.") (internal quotation marks omitted); McKenzie v. Milwaukee County, 381 F.3d 619, 624 (7th Cir. 2004) (holding that the impact of "'second-hand' harassment is not as great as harassment directed at [the plaintiff] herself").  Plaintiff heard Hilliard make derogatory statements twice—when he declared that "all females were worthless" and an that agent was "a good agent for a female."  The remainder of his remarks (on agents' menstrual cycles, bra sizes, sexual desirability, and the like) were not only relayed to Plaintiff by others, they also amount to "the occasional vulgar banter, tinged with sexual innuendo . . . [that is] neither pervasive nor

offensive enough to be actionable." Perry v. Harris Chernin, Inc., 126 F.3d 1010, 1013 (7th Cir. 1997).

Second, while "[t]here is no minimum number of incidents required to establish a hostile work environment," Worth v. Tyer, 276 F.3d 249, 268 (2001), a reasonable jury instructed as to the standard in this Circuit could not find that Hilliard's two comments within Plaintiff's hearing were severe or pervasive. According to that standard, "[n]ot every unpleasant workplace is a hostile environment," Perry, 126 F.3d at 1014, and "Title VII is not a general code of workplace civility, nor does it mandate admirable behavior from employers." McKenzie, 381 F.3d at 624 (internal quotation marks omitted).

The fate of the vast majority of hostile work environment claims in this Circuit compels the conclusion that Hilliard's two comments are nothing more than evidence that an unpleasant supervisor needs civility training. In McKenzie, 381 F.3d at 625, for example, the court ruled that "[o]ne of the comments [the plaintiff] points to—'George thinks women are only good for fucking'—is indeed offensive, but . . . is insufficient to establish severe or pervasive harassment." In Hildebrandt v. Illinois Department of Natural Resources, 347 F.3d 1014 (7th Cir. 2003), the plaintiff complained that (1) she overhead two off-color jokes, (2) she was told she had to be reviewed quarterly whereas her male counterparts were not (although the reviews never happened), (3) two supervisors sat in on her evaluations whereas one only sat in during her male co-workers' evaluations, and (4) she was required to go through a supervisor to complete projects more often than were her male co-workers. The court ruled against the plaintiff because "[t]he enumerated acts alleged . . . at most inconvenienced her, and there is no evidence that any of them 'unreasonably interfere[d]' with her work." Id. at 1035. In Russell v. Board of Trustees

of University of Illinois at Chicago, 243 F.3d 336 (7th Cir. 2001), the plaintiff provided evidence "of offensive behavior and boorish comments and signs, but *nothing exceeding that level*" where the defendant referred to the plaintiff as "grandma," believed that all intelligent women are unattractive, called each of the plaintiff's female colleagues a bitch at least once, and told a colleague that she dressed "sleazy" and "like a whore" and that she had been hired for her looks. Id. at 343-44 (emphases added).   As if the outcome of these cases is not enough to demonstrate the high bar for severity or pervasiveness in this Circuit, the Wyninger court confirmed that even "acts *going beyond* occasional vulgar banter . . . [sometimes] fail to constitute an objectively hostile environment." Wyninger, 361 F.3d at 977 (emphases added).

The facts in the few cases where plaintiffs produced sufficient evidence to support an objectively hostile workplace claim are radically different from the facts presented here.   In Gentry,  238 F.3d at 850-51, the defendant, eighteen years the plaintiff's senior, touched and subjected her to full embraces everyday, obliquely invited her to have sex with him, and showed her off-color pictures.   In Worth, 276 F.3d at 267-68, there was sufficient evidence to conclude that the male supervisor's conduct was severe because he touched the plaintiff's body, including her breast near the nipple for several seconds, multiple times over a two-day period.  In Hostetler v. Quality Dining, Inc., 218 F.3d 798, 807-08 (2000), the court had "no doubt that the type of conduct at issue [fell] on the actionable side of the line dividing abusive conduct from behavior that is merely vulgar or mildly offensive" where the co-worker sexually propositioned the plaintiff, forcibly interested his tongue into her mouth, and attempted to remove her bra.  Finally, in Timm v. Progressive Steel Treating, Inc., 137 F.3d 1008 (7th Cir. 1998), the court held that a reasonable jury could find for the plaintiff where her co-worker often snuck up from behind her

and grabbed or pinched her buttocks and sometimes ran his hand up her thighs, and where "[s]exual comments and propositions from [him] were everyday fare . . . despite her protests." Id. at 1009.

In sum, given the pattern in this Circuit, a reasonable jury could not on the facts presented here find that the comments allegedly directed at Plaintiff were frequent, physically threatening or humiliating, or capable—by themselves—of unreasonably interfering with her work performance. Nor could a reasonable jury conclude that a reasonable person would find Hilliard's inappropriate comments so severe or pervasive as to create an abusive work environment. Accordingly, Plaintiff's hostile work environment claim fails as a matter of law.[3]

## IV.  CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is GRANTED IN PART and DENIED IN PART.

Enter:


/s/ David H. Coar

David H. Coar

United States District Judge


Dated: **August 25, 2006**

---

[3] Because Plaintiff's hostile work environment claim fails at this stage, the Court does not reach the third element Plaintiff must prove (whether there is a basis for employer liability).